# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

IN RE:

JAMES RANDALL MILLER,

                             Debtor,

LEGACY REAL ESTATE INVESTMENTS,
LLC, et al.,

vs.                                             Case No. 11-CV-130-GKF-FHM

JAMES RANDALL MILLER,

                Appellee/Cross-Appellant.

## REPORT AND RECOMMENDATION

The instant appeal from the United States Bankruptcy Court for the Northern District of Oklahoma is before the undersigned United States Magistrate Judge for report and recommendation.

## Background

The Bankruptcy Court issued two decisions that are the subject of this report and recommendation. [Dkt. 5-3, pp. 626-668; Dkt. 6-1, pp. 100-126; Dkt. 6-1, p. 127].[1] The involuntary bankruptcy petition filed against the debtor by four of his creditors, was dismissed based on the Bankruptcy Court's finding that three of the four creditors did not qualify to be petitioning creditors under 11 U.S.C. § 303(b)(1). The debtor was awarded $259,773.27 in attorney fees and expenses, with the petitioners jointly and severally liable for that amount. The Bankruptcy Court found the petition was not filed in good faith, but

---

[1] The record on appeal is filed in two cases. References to Dkt. 5 are to the record filed in Case No. 11-CV-130-GKF-FHM; references to Dkt. 6 are to the record filed in Case No. 11-CV-460-GKF-FHM.

declined to award the debtor compensatory damages because the debtor failed to prove causation or the amount of damages. The Bankruptcy Court also declined to award punitive damages, finding the attorney fee award sufficiently served the deterrent purpose of punitive damages.

## Relief Requested

The petitioning creditors request the following relief:

> 1) reversal of the Bankruptcy Court's conclusion that the claims of Legacy Real Estate Investments, LLC and Summit Bank were the subject of a bona fide dispute as of the date of the filing of the involuntary petition;
>
> 2) reversal of the dismissal of the involuntary case and remand of the case to the Bankruptcy Court for further proceedings; or at a minimum,
>
> 3) reversal of the Bankruptcy Court's joint and several award of attorneys' fees and expenses in favor of Miller; and
>
> 4) reversal of the Bankruptcy Court's conclusion that they filed the involuntary petition in bad faith.

[Dkt. 25, p. 64].

The debtor requests that "this Court reverse the Bankruptcy Court on the issue of actual damages and award such damages in the amount of at least $675,000.00." [Dkt. 24, p. 10]. Debtor also requests that the Bankruptcy Court be reversed on the denial of punitive damages and that the case be remanded for further consideration of punitive damages. *Id*.

## Recommendation

For the reasons hereafter discussed, the undersigned RECOMMENDS that the decision of the Bankruptcy Court be AFFIRMED, except for the finding that the involuntary petition was not filed in good faith.[2]

## Standard of Review

Conclusions of law are reviewed *de novo*. The Bankruptcy Court's factual findings are reviewed under the clearly erroneous standard. A factual finding is clearly erroneous when the reviewing court, considering all the evidence, is left with the definite and firm conviction that a mistake has been committed. *Bartmann v. Maverick Tube*, 853 F.2d 1540, 1543 (10th Cir. 1998)(quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 673, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Under the abuse of discretion standard, an appellate court will not disturb a trial court's decision absent "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Thomas v. International Business Machines*, 48 F.3d 478, 482 (10th Cir. 1995), *quoting United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).

## Analysis

### Dismissal of Bankruptcy Petition

In order to commence an involuntary bankruptcy petition under 11 U.S.C. § 303(b)(1), there must be at least three creditors who each have a claim against the debtor that is not contingent as to liability and is not the subject of a bona fide dispute as to liability

---

[2] As discussed later in this report, reversing the Bankruptcy Court on the issue of bad faith will not require remand for further proceedings.

or amount.  *Bartmann*, 853 F.2d at 1543 (a petitioning creditor does not have standing when its debt is subject to a bona fide dispute).  The Tenth Circuit has stated that a bona fide dispute exists under 11 U.S.C. § 303(b)(1) where there is an objective basis for a factual or legal dispute as to the validity of the debt.  *Bartmann*, 853 F.2d at 1544.  The parties do not dispute the facts.  Therefore, as applied to this case, the question is whether an objective basis exists for questioning Miller's[3] legal liability to Legacy Real Estate Investments, LLC (Legacy) or Summit Bank (Summit).

The Bankruptcy Court found that Creditor Bullock met the requirement of having an undisputed claim, but that Creditors Legacy, Summit, and Harley did not.  [Dkt. 5-3, pp. 626-668].  Harley has not appealed this finding.  Since there must be at least three qualifying creditors, the Bankruptcy Court's dismissal of the bankruptcy petition must be affirmed if the claims of <u>either</u> Legacy <u>or</u> Summit are the subject of a bona fide dispute as to liability or amount.

<u>Legacy's Status as Petitioning Creditor</u>

The Bankruptcy Court ruled that there exists a bona fide dispute about Miller's liability to Legacy because a question exists as to whether a release of liability given by Legacy to Miller in a Foreclosure Agreement is effective.

Miller's alleged indebtedness to Legacy is based on loans made by Legacy which were secured by real estate in Colorado and Tulsa, Oklahoma.  The loans were personally guaranteed by Miller.  Following default on the loans the parties entered into a Foreclosure Agreement whereby Miller acknowledged a debt to Legacy of $2,882,574.31 and

---

[3]For ease of reading, Miller's affiliated entities are referred to throughout this Report and Recommendation as "Miller."

confessed judgment in the amount of the debt.   [Dkt. 5-1, p. 51]. Miller also consented to foreclosure of the Legacy liens on the Colorado property and agreed he would not contest or interfere with the foreclosure proceedings.  In exchange, as long as Miller was not in default of his promises, Miller would be released of his liability by Legacy.

A foreclosure action ensued in Colorado.  Miller filed pleadings contesting the foreclosure action on various grounds.  The Colorado Court granted Legacy summary judgment, [Dkt. 5-2, p. 268], and a Judgement of Foreclosure was entered, [Dkt. 5-2, p. 309].  The Colorado Court also found there was no genuine issue for trial regarding Miller's default under the loan agreements and "admission to indebtedness in the amount of $2,882,574.31 under the Foreclosure Agreement." [Dkt. 5-2, p. 269].  The Court further found there was no question that Miller had "agreed to a non-contested foreclosure pursuant to the Foreclosure Agreement" and that Legacy was entitled to foreclose. *Id.*  The Court granted Legacy judgement in the amount of $2,882,574.31, and found that Legacy was entitled to its attorneys fees and costs of collection and foreclosure, "except as to the parties to the 'Foreclosure Agreement,' because attorneys fees and costs were waived as to them." *Id*.

Legacy took issue with the denial of its request for attorney fees and moved for amendment and clarification of the Colorado Court's findings regarding attorney fees.  [Dkt. 5-3, p. 78].  Legacy asserted that the loan documents all contained provisions granting Legacy the right to collect attorney fees in the event of default; that the Foreclosure Agreement did not provide that the amount of indebtedness confessed included attorney fees and costs; and that the Foreclosure Agreement provides that in an action to enforce the Foreclosure Agreement the prevailing party shall be awarded its costs and expenses,

5

including reasonable attorney fees. [Dkt. 5-3, p. 81]. In the Colorado Court Legacy argued that it "necessarily filed its Motion for Summary Judgment seeking to enforce the Foreclosure Agreement due to [Miller's] noncompliance thereunder." [Dkt. 5-3, pp. 81-82]. Therefore, according to Legacy, under the Foreclosure Agreement Legacy was entitled to collect its attorney fees and costs. *Id.*

The Colorado Court denied Legacy's motion for fees and explained that while Legacy was the prevailing party, provisions of the Foreclosure Agreement preclude awarding attorney fees and costs to Legacy. [Dkt. 5-3, p. 85]. The Court cited the following provisions of the Foreclosure Agreement: "Miscellaneous", paragraph 10, subparagraph (d); "Mutual Release", paragraph 13 subparagraph (b); and "Confession of Judgements" paragraph 4. [Dkt. 5-3, pp. 85-86].

Paragraph 4 addresses "Confession of Judgment" and provides in relevant part:

> In conjunction with the Legal Proceedings, Borrow shall (and Guarantor agrees to cause Borrower to) confess judgment in an amount equal to the Total Indebtedness Amount.[4] Upon written request from Lender, Borrower and Guarantor shall take actions to support Lender's position in the Legal Proceedings and Borrower and Guarantor agree not to present any defense to, object, contest, delay or forestall, in any manner or for any reason whatsoever, the Legal Proceedings. Further, Borrower and Guarantor agree, upon receipt, to execute and deliver to Lender's counsel all consents, waivers, affidavits, conveyances, deeds, assignments, approvals, or other documentation (collectively hereinafter referred to as the "Consent Documents") as are requested by Lender's counsel in connection with the Legal Proceedings. . . . <u>So long as Borrower and Guarantor are not in default hereunder, Lender agrees not to seek any deficiency judgment against either Borrower or Guarantor.</u>

---

[4] The Total Indebtedness Amount, $2,882,574.31, is set out in ¶ 2 of the Foreclosure Agreement. [Dkt. 5-1, p. 51].

[Dkt. 5-1, p. 51] (emphasis supplied).

Paragraph 10(d) provides: "If any action, suit or other proceeding is brought to enforce, or for the breach of, this Agreement, the prevailing party shall be awarded its costs and expenses (including reasonable attorney's fees and costs)." [Dkt. 5-1, p. 54]. Paragraph 13(b) provides: "so long as Borrow and Guarantor shall have performed all of their obligations hereunder, Lender . . . shall be deemed to have fully and completely released Borrower and Guarantor from any and all liabilities, damages, causes or actions and all claims of any nature whatsoever that Lender has against either Borrower or Guarantor arising out of any transaction occurring prior to the execution hereof." [Dkt. 5-1, p. 55].

After citing these provisions, the Colorado Court stated, "Legacy did not allege or prove a breach of contract of the 'Foreclosure Agreement' by Defendants Miller as to any of the preconditions under that agreement that would entitle Legacy to a judgment for costs and attorney fees against Defendants Miller". [Dkt. 5-3, p. 86]. The Court also stated that the issues and arguments raised in Legacy's motion "were thoroughly addressed at the hearing and by this court's rulings which were supported by the law and the facts." *Id.*

The Bankruptcy Court found that Legacy's viability as a creditor hinges on the Foreclosure Agreement. [Dkt. 5-3, p. 653]. Legacy argued to the Bankruptcy Court that the Foreclosure Agreement was not at issue in the Colorado action because Legacy did not plead breach of the Agreement and did not seek to enforce it. The Bankruptcy Court rejected this argument. The Bankruptcy Court found the Colorado Court's reliance on the terms of the Foreclosure Agreement as the basis for denying Legacy's motion for attorney fees demonstrates the existence of a bona fide dispute regarding the validity of Legacy's

7

claim against Miller. Legacy states that the Bankruptcy Court reached this conclusion by making a strained reading of Legacy's foreclosure complaint and by overstating the intended breadth of the Colorado Court's denial of Legacy's legal fees. According to Legacy, based on the evidence before it, the Bankruptcy Court should have determined that Miller's failure to cooperate and fighting the Colorado foreclosure was a clear and unequivocal breach of the Foreclosure Agreement and concluded that the release of liability contained in the Foreclosure Agreement does not constitute a bona fide dispute as to Miller's liability.

The undersigned notes the Bankruptcy Court did not decide or give an opinion about whether the Colorado decision operates as a bar to any further action against Miller by Legacy, or whether the Colorado decision is a conclusive finding that Miller is entitled to the protection afforded by the release contained in the Foreclosure Agreement. [Dkt. 5-3, p. 654]. The Bankruptcy Court merely observed that at a minimum an issue about the effectiveness of the release of Miller is present, and that the issue creates a bona fide dispute regarding the validity of the Legacy claim against Miller. *Id.*

The undersigned finds no error in the Bankruptcy Court's conclusion. As a matter of fact, although Legacy did not plead breach of the Foreclosure Agreement, Legacy certainly did interject the Foreclosure Agreement into the Colorado proceedings. Further, the Colorado Court certainly denied Legacy fees based on the terms of the Foreclosure Agreement. In addition, the Colorado Court relied on the Foreclosure Agreement for other aspects of its decision. The Colorado Court cited Miller's admission to indebtedness in the amount of $2,883,574.31 under the Foreclosure Agreement. [Dkt. 5-2, p. 269]. The

8

Colorado Court also cited the fact of Miller's Agreement to a non-contested foreclosure pursuant to the Foreclosure Agreement.

The undersigned finds that the Colorado Court's citation of and reliance on the Foreclosure Agreement raises questions as to whether other provisions of the Foreclosure Agreement are enforceable, including the provision which purported to release Miller from liability. The question is not whether Legacy has a decent, or even good argument in favor of its conclusion that the release contained in the Foreclosure Agreement is not operative, but whether there is a objective basis for an argument that it is not. The undersigned finds that an objective basis for argument exists and therefore recommends that the Bankruptcy Court's finding that Legacy does not qualify as a petitioning creditor under §303(b)(1) be affirmed.

**Summit's Status as Petitioning Creditor**

The Bankruptcy Court found that there is no question that Miller was loaned $800,000 either directly or with Miller as a guarantor. However, the Bankruptcy Court ruled that Summit is not eligible to be a petitioning creditor because a bona fide dispute exists as to Miller's liability and the amount of the liability. [Dkt. 5-3, p. 656].

The loans Summit made to Miller were secured by mortgages on real estate in Oklahoma and by a deed of trust on a lot in Colorado. Miller sold the Colorado lot to Troy Hudspeth. Hudspeth executed a deed of trust and promissory note to Miller. Summit released Miller's deed of trust in exchange for collateral rights in Miller's loan to Hudspeth. Hudspeth defaulted, and foreclosure proceedings were instituted in Colorado with Miller acting under a power of attorney granted by Summit. Miller was not in default of any obligations to Summit at the time the Power of Attorney was given to him.

Judgement was entered in Miller's favor and a Sheriff's sale was scheduled for July 30, 2009. Miller had entered into a contract to sell the Colorado lot to Bush Mountain for $500,000. The sale was to close on July 31, 2009, the day after the Sheriff's sale. Summit was to receive the proceeds and agreed to extend the maturity of Miller's loans. Miller submitted the sole bid at the Sheriff's sale for $889,053.73, the full amount  Hudspeth owed Miller under the judgment. The Bankruptcy Court found Summit was aware of the amount of the bid and did not object. [Dkt. 5-3, p. 38]. The sale to Bush Mountain was not completed. On August 13, 2009, a Sheriff's Certificate was prepared that reflected Miller was the purchaser at the sale and would be entitled to a deed to the property at the end of the redemption period.

On September 1, 2009, Summit sent a Motion to Clarify to the Colorado Court for filing in the Hudspeth foreclosure wherein Summit sought the following findings:  1) that Summit was the holder of the Hudspeth note and deed of trust; 2) that Miller acted solely as Summit's agent on the Hudspeth foreclosure; and 3) that Summit is the actual holder of the Sheriff's Certificate. Summit also sought an order directing the Sheriff to execute, deliver, and record a deed to the Colorado lot listing Summit as the grantee. Summit asserts that "it is uncertain whether the Motion to Clarify was ever filed with the Colorado Court."[5]  [Dkt. 25, p. 28]. Regardless, and apparently without the necessity of a court order, the Sheriff executed a deed on the Colorado lot listing Summit as the grantee. Summit asserts that action mooted its Motion to Clarify, and as a result the Bankruptcy

---

[5] The undersigned observes that whether the motion was filed is an ascertainable fact, and a fact that one would expect Summit to know.

Court should not have considered the existence of the motion as indicating that a bona fide question exists as to Miller's liability.

The undersigned finds that the following simplified step-by-step analysis demonstrates the existence of objective questions as to Miller's liability which preclude Summit from qualifying as a petitioning creditor. The sale of the Colorado lot to Hudspeth seems to have affected no change in Miller's obligations to Summit. Summit's role there was to release the Colorado deed of trust to enable Miller to file his own deed of trust to reflect Miller's relationship to Hudspeth vis-a-vis that property. The only thing that changed between Miller and Summit at that point was the form of Summit's collateral. Absent some other dealings between Summit and Miller, Hudspeth's default and the ensuing foreclosure action against Hudspeth should not have changed the fact that Miller still owed a debt to Summit.

Miller's submission of a bid at the Sheriff's sale of the Colorado lot for $889,053.73, the full amount of Hudspeth's indebtedness to Miller, served to extinguish Hudspeth's indebtedness to Miller.[6] The extinguishment of Hudspeth's indebtedness to Miller would not, of itself, have any effect on Miller's indebtedness to Summit. However, in its Motion to Clarify Summit asked the Colorado Court, *inter alia*, to make a finding that Summit was the holder of the Hudspeth note and deed of trust. Summit also requested that the deed on the Colorado lot be issued in Summit's name. Although it does not appear that the

---

[6]   *Jefferson Bank & Trust v.* Hunt, 705 P.2d 993, 995 (Colo. App. 1985)(It is universally acknowledged that a bid including the full balance at a foreclosure sale constitutes payment in full of promissory notes and such a bid wipes out the obligation of a promissory note secured by a deed of trust or a mortgage); Imperial *Mortgage Corp. v. Travelers Indemnity Company of Rhode Island*, 599 P.2d 276, 277 (Colo. App. 1979)(the entire debt is satisfied when the full amount due is bid and accepted on the note).

Colorado Court made the requested findings, in fact the deed was actually issued to Summit. The ultimate effect of this sequence of events on Miller's indebtedness to Summit is not clear. What is clear is that some court will have to puzzle that out together with Summit's claims that Miller breached fiduciary duties. The bona fide dispute is whether issuance of the deed to Summit instead of Miller following the full credit bid released Miller in the same way that the bid released Hudspeth's indebtedness to Miller.

The foregoing leads the undersigned to recommend that the Bankruptcy Court's finding that Summit does not qualify as a petitioning creditor under §303(b)(1) be affirmed. The undersigned agrees with the Bankruptcy Court that Summit's claim against Miller is the subject of a bona fide dispute.[7]

The undersigned rejects Summit's assertion that legal machinations by Miller in connection with the Colorado foreclosure should have been viewed by the Bankruptcy Court as being similar to a debtor's subjective belief that a debt is disputed, which will not control whether a claim is subject to a bona fide dispute. Summit asserts that "the conclusion of one bankruptcy court in another case fits this case perfectly: 'the assertion of creative defenses by a debtor is not sufficient to establish a bona fide dispute.' *In re CLE Corp.*, 59 B.R. 579, 584 (Bankr. N.D. Ga. 1986)". [Dkt. 25, p. 44]. The undersigned finds that the situation in this case is vastly different from that in *In re CLE Corp.*

---

[7] The Bankruptcy Court also found that Summit was ineligible on the basis that it was not clear whether Summit holds an unsecured claim in excess of the value of the properties held as collateral. [Dkt. 5-3, p. 656]. Summit asserts that finding is wrong and cites cases to the effect that even a fully secured creditor is eligible to be a petitioning creditor as long as the aggregated debts of the other unsecured creditors reach the statutory requirement. [Dkt. 25, p. 45].

There is authority for Summit's position on this point. *Paradise Hotel Corporation v. Bank of Nova Scotia*, 842 F.2d 47, 49 (3rd Cir. 1988). The issue need not be resolved in this case, however, because Summit is ineligible to be a petitioning creditor on the basis of the questions concerning Miller's liability.

In *CLE* the Court observed that none of the "so-called disputes" were developed until after the debtor met with counsel after the filing of the involuntary petition. 59 B.R. at 584. Until the petition was filed, the debtor acknowledged the obligations, expressed a desire to satisfy the obligations, and entered into negotiations to work out the obligations. *Id*. In contrast to *In re CLE Corp.*, the legal maneuvering here pre-dated the involuntary petition. What Summit is really asking the court to do is to make a determination about the effect of the pre-petition legal maneuvering. However, in *Bartmann* the Tenth Circuit instructed that in considering whether a bona fide dispute exists the court need not determine the probable outcome of the dispute, but merely determine whether one exists. 853 F.2d at 1544.

### Liability of Creditor Bullock for Attorney Fees

The Bankruptcy Court entered a judgment holding the petitioning creditors jointly and severally liable for attorney fees and expenses in the amount of $259,773.27 under 11 U.S.C. § 303(i).[8] [Dkt. 6-1, p. 127].

Bullock argues that the Bankruptcy Court erred in holding him jointly and severally liable for the fee award. Bullock states that the Bankruptcy Court failed to weigh the appropriate factors in making the decision to award fees, rigidly held that all the petitioning

---

[8] 11 U.S.C. §303(i) provides:
> If the court dismisses [an involuntary petition] other than on the consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this section, the court may grant judgment –
> > (1) against the petitioners and in favor of the debtor for–
> > > (A) costs; or
> > > (B) a reasonable attorney's fee; or
> > (2) against any petitioner that filed the petition in bad faith, for–
> > > (A) any damages proximately caused by such filing; or
> > > (B) punitive damages.

creditors were liable, and failed to take into account the merits of Bullock's claim which was not the subject of a bona fide dispute in finding Bullock jointly and severally liable for fees under §303(i)(1). According to Bullock, instead of finding the creditors jointly and severally liable, the Bankruptcy Court should have made an individualized consideration of the totality of the circumstances, including the merits of Bullock's claim, which would have resulted in finding Bullock was not liable for fees.

The undersigned finds that, contrary to Bullock's assertions, the Bankruptcy Court did not rigidly apply joint and several liability for the attorney fees. The Bankruptcy Court cited the assertions made in the Petitioning Creditors' Closing Statement and Argument in Support submitted November 17, 2010[9] that the creditors' purpose in filing the involuntary petition was the orderly and expeditious liquidation of Miller's non-exempt assets. The Bankruptcy Court noted the creditors' allusions to preferential transfers and the need to preserve Miller's estate. [Dkt. 5-3, pp. 663-64]. The Court also noted that despite ample opportunity for discovery, the record was devoid of evidence as to what assets are owned by Miller or of preferential payments to creditors. The Bankruptcy Court also stated that if a creditor were filing an involuntary petition on the basis that non-exempt assets were being dissipated or that transfers subject to avoidance had taken place, given the ample opportunity for discovery some evidence would be expected. *Id*. at 664. The Bankruptcy Court also examined each of the petitioning creditors' testimony about their motivations for joining the involuntary petition. *Id*. at 647-648.

---

[9] The Closing Statement is not included in the record on appeal.

With regard to Bullock, the Bankruptcy Court cited Louis Bullock's testimony that he believed that the filing of a bankruptcy petition would be the most efficient way to collect the moneys owed to him. The Bankruptcy Court also noted that Bullock suggested Miller might possess assets available to satisfy claims, but Bullock was unable to identify any. [Dkt. 5-3, pp. 648-49]. In addition, the Bankruptcy Court observed that Bullock was engaged in state court litigation with Miller to collect the debt owed. [Dkt. 5-3, p. 662]. These specific references indicate that the Bankruptcy Court considered facts particular to Bullock, and did not simply lump him in with the other petitioning creditors. These references also demonstrate the Bankruptcy Court's conclusion that the petitioning creditors filed the petition on the basis that they preferred the Bankruptcy Court as a more efficient means to collect their debts than protracted state court litigation is applicable to Bullock.

Rather than attempt to demonstrate that the Bankruptcy Court's analysis is factually wrong or inapplicable to him, Bullock argues that the fee award should be reversed because the Bankruptcy Court did not apply the "totality of the circumstances" test to each of the creditors and therefore did not take into account the merits of his claim. The "totality of the circumstances" test suggests the following factors be considered: 1) the merits of the involuntary petition; 2) the role of any improper conduct on the part of the alleged debtor; 3) the reasonableness of the actions taken by the petitioning creditors; 4) the motivation and objectives behind filing the petition; and 5) other material factors the court deems relevant. *In re Hentges*, 351 B.R. 758, 770 (Bankr. N.D. Okla. 2006). According to Bullock, because the Bankruptcy Court did not apply this test, no consideration was given to the fact that his claim was a qualifying claim under §303(b).

15

The "totality of the circumstances" test advocated by Bullock has not been adopted by the Tenth Circuit as the test required for exercise of the court's discretion under §303(i)(1). Further, that test does not list the merits of a creditor's claim as one of the factors. Consideration of the merits of the involuntary petition is not the same thing as consideration of the merits of an individual creditor's claim. The undersigned views the merits of the involuntary petition to be a broader inquiry beyond the claims of an individual creditor. In any event, although the Bankruptcy Court did not phrase its analysis in terms of the "totality of the circumstances test," the undersigned finds that the Bankruptcy Court took into account similar factors.

The undersigned finds that Bullock's argument that the Bankruptcy Court failed to take into account the merits of his claim should be rejected.[10] The fact that a petitioner has a meritorious claim does not preclude an award of attorney fees under §303(i). *In re Kidwell*, 158 B.R. 203, 216 (Bankr. E.D. Cal. 1993). In view of the factors that were discussed by the Bankruptcy Court, the undersigned finds that Bullock's assertion that the Bankruptcy Court failed to consider the merits of his claim is essentially an invitation for this court to reweigh the evidence. However, the decision to award fees under §303(i)(1) is a matter committed to the Bankruptcy Court's discretion. *Southern Cal. Sunbelt Dev. Inc.*, 608 F.3d 456, 464 (9th Cir. 2010)(court has considerable discretion in determining fees under §303(i)); *Susman v. Schmid (In re Reid)*, 854 F.2d 156, 159-60 (7th Cir. 1988)(decision to award fees under 303(i) is left to discretion of the Bankruptcy Court and bad faith is not necessary for fee award); *In re Kidwell*, 158 B.R. 203, 216 (Bankr. E.D. Cal.

---

[10] The fact Bullock was a qualifying creditor is a factor that the Bankruptcy Court should have taken into account in making the bad faith finding as discussed later in this recommendation.

1993).  Bullock has not demonstrated that the Bankruptcy Court exceeded the bounds of permissible choices in the circumstances.

<b>The Bad Faith Finding</b>[11]

A finding of bad faith is necessary under §303(i)(2) for an award of damages to the debtor.  Although the Bankruptcy Court found the petitioning creditors filed the involuntary petition in bad faith, the Bankruptcy Court did not actually award damages to Miller because he failed to prove damages.  Therefore, the bad faith finding had no real effect on the outcome of this case and had no monetary effect on the creditors.  Under these circumstances analysis of the bad faith finding might be considered to be an academic exercise.  However, Miller has appealed the Bankruptcy Court's denial of actual and punitive damages and the possibility exists that a later reviewing court may disagree with some of the conclusions reached herein.  Further, not unlike the filing of an involuntary bankruptcy petition, a finding of bad faith may have adverse consequences for the creditors or their attorneys outside of the instant litigation.

Section 303(i)(2) permits an award of damages against any petitioner who filed the petition in bad faith.  The statute does not state which party has the burden of proof on the bad faith issue, what quantum of proof is required, or whether any presumptions apply.  The Bankruptcy Court did not discuss these issues, which hampers effective review on appeal.  The Bankruptcy Court acknowledged that the Tenth Circuit has not directed what test is to be employed in making a finding of bad faith under §303(i)(2) and that there are

---

[11]  Although the undersigned found the Bankruptcy Court's analysis sufficient for the purpose of awarding attorney fees under §303(i)(1) which is a matter entirely committed to the Bankruptcy Court's discretion, the analysis is not sufficient for the more onerous finding of bad faith under §303(i)(2).

a number of tests other courts have employed.  The Bankruptcy Court identified those tests in its opinion.  [Dkt. 5-3, p. 661-62].  However, the Bankruptcy Court did not analyze the facts of this case in relation to the factors identified in any of those tests.  *See FDIC v. Schuchmann*, 319 F.3d 1247, 1253-54 (10th Cir. 2003)(award of attorney fees based on bad faith exception to American Rule reversed where court failed to explain how facts constituted bad faith and the evidence the court pointed to fell short of clear evidence of bad intent).

Which party bears the burden of proof and what burden is applied may be particularly important when deciding the question of whether a party acted with an improper purpose.  In its decision the Bankruptcy Court stated that the Petitioners' claims of good faith ring hollow.  This seems to place the burden of proof on the Petitioners to prove the absence of bad faith by proving good faith.  Case authority, however, holds that there is a presumption of good faith in favor of the Petitioners and that the debtor has the burden of proving bad faith.  *In re John Richards Homes*, 439 F.3d 248, 254 (6th Cir. 2006), *In re Bayshore*, 209 F.3d 100, 105 (2nd Cir. 2000)(there is a presumption of good faith in favor of the petitioning creditor, thus the debtor has the burden of proving bad faith), *In re Hentges*, 351 B.R. 758 (N.D. Okla. 2006), *In re Reveley*, 148 B.R. 398, 406 (Bankr. S.D. N.Y. 1992) (there is a presumption of good faith on the part of petitioners, the objecting party has the burden of proving bad faith, and bad faith must be proven against each petitioning creditor against whom an award of damages is sought under §303(i)(2)), *In re Apache Trading Group*, 229  B.R. 891, 892-93 (Bankr. S.D. Fla. 1999)(same).  Since the Bankruptcy Court did not address the burden of proof, the decision does not provide a

sufficient basis for the court to determine whether the proper legal standards were applied in determining that the Petitioners acted in bad faith under §303(i)(2).

The Bankruptcy Court also failed to make factual findings about the reasonableness of Petitioners' position that their claims were not subject to a bona fide dispute. If the Petitioners reasonably believed that Miller was not paying his debts as they came due and that their claims were not subject to a bona fide dispute, filing an involuntary petition in order to have a trustee appointed and to seek a pro rata share of Miller's non-exempt assets does not appear to be an improper purpose. "Creditors are justified in filing an involuntary bankruptcy against a debtor where exclusive bankruptcy powers and remedies may be usefully invoked . . . [c]reditors may also use the bankruptcy process to install a trustee to prevent future transfers or wasting or dissipation of assets . . . " *In re Hentges*, 351 B.R. at 772. "There is no bad faith where the petitioners support their positions with reasonable arguments." *In re Reveley,* 148 B.R. at 408. The cases cited by the Bankruptcy Court, *In re Nordbrock*, 772 F.2d 397 (8th Cir. 1985) and *In re SBA Factors of Miami, Inc.*, 13 B.R. 99 (Bankr. D. Fla. 1981), do not support a contrary conclusion. In both of the cited cases, the holdings were made in the context of determining whether the debtor's situation satisfied the §303(h)(1) criteria of generally not paying debts as they became due, an issue not addressed by the Bankruptcy Court in this case. Further, the *Nordbrock* Court did not even mention bad faith.

In *In re Nordbrock* the creditor sought to recover a debt of around three million dollars arising from a guarantee. The obligation was the only obligation of the debtor. The Court was addressing the question of whether the debtor was generally paying his debts

as they became due when it stated that the "efforts by a single creditor to use the Bankruptcy Court as a forum for the trial and collection of an isolated disputed claim [was] a practice condemned in prior decisions." 772 F.2d at 399. One of the cases cited by the *Nordbrock* Court discussed concerns about the use of an involuntary petition as an alternative collection device and stated those concerns were particularly compelling where the debtor was clearly solvent and therefore could not have been making voidable preferences and could not have made fraudulent transfers. *Matter of Goldsmith*, 30 B.R. 956, 963-64 (Bankr. N.Y. 1983). Another of the cases cited by the *Nordbrock* Court, *In re R.N. Salem Corp.*, 29 B.R. 424, 429 (Bankr. S.D. Ohio 1983), discussed whether disputed debts should, or should not, be included in the consideration of whether a debtor was paying debts as they became due. In the course of that discussion, the Court expressed its concern that bankruptcy procedures not be used as a collection device to force a debtor to pay a legitimately disputed debt to avoid bankruptcy. *In re Nar-Jor Enterprises Corp.*, 6 B.R. 584 (Bankr. S.D. Fla. 1980) involved the same considerations. The instant case is not comparable to any of these cases. Given that *Nordbrock* did not contain a bad faith finding or even address the issue, and considering the actual holding of *Nordbrock,* the context in which the holding arose, and the cases cited by that Court, the undersigned finds that *Nordbrock* does not provide authority for a bad faith finding, especially in the absence of specific discussion of the factors listed in one of the bad faith tests.

The Bankruptcy Court also cited *In re SBA Factors*, 13 B.R. 99, 100-101 (Bankr. S.D. Fla. 1981). In that case the Court stated that the petitioners were using the involuntary bankruptcy proceeding as a substitute for customary collection practices and

found that the petitioners filed or joined the filing of the petition in bad faith. An examination of how the *SBA* Court arrived at the bad faith finding demonstrates that the specific factual situation presented in *SBA* rather than the policy statement about use of bankruptcy procedures led the *SBA* Court to conclude that the petitioners had filed in bad faith.

The *SBA* Court found that the petitioners completely failed to carry their burden under §303(h)(1) to show that the debtor was not paying his debts as they became due. The Court stated there was no evidence that SBA owed any debt to two of the petitioning creditors. There was no evidence that SBA had even been billed by two creditors or invoiced by the third creditor. Further, the Court found that the evidence was not sufficient to take the claims of the petitioning creditors out of the statute of frauds. *Id*. at 100. The Court set out these factors in its decision before concluding that the bankruptcy filing was being used as a substitute for customary collection procedures and the involuntary petition was therefore filed in bad faith. *Id*. at 100-101. In the instant case the Bankruptcy Court's decision does not contain the case-specific fact intensive type of discussion that supported the bad faith finding in the *SBA* case. *See In re Smith*, 243 B.R. 169, 194-202 (Bankr. N.D. Ga. 1999)(extensive discussion of facts and findings in support of bad faith finding).

The undersigned is persuaded by the Creditors' assertions that the desire to collect a debt underlies every creditor's participation in a bankruptcy case. Therefore a desire to collect debts does not necessarily support a bad faith finding. The undersigned recommends reversal of the Bankruptcy Court's bad faith finding because the Bankruptcy Court's decision does not demonstrate the appropriate analysis to support that conclusion.

Furthermore, the cases cited by the Bankruptcy Court which provide the underpinning for the bad faith finding are factually inapposite.[12]  In addition, in other contexts a bad faith finding requires more than a showing of a weak or legally inadequate case.  *FTC v. Kuykendall*, 446 F.3d 1149, 1153 (10th Cir. 2006).  Likewise, findings of mere negligence will not generally support a finding of bad faith.  *FDIC v. Schuchmann*, 319 F.3d at 1252.

The Bankruptcy Court also failed to clearly make findings pertaining to the alleged bad faith of each of the Petitioner's separately, to specifically weigh the fact that the Bullock claim was not subject to a bona fide dispute and to discuss the effect of the Petitioner's reliance on advice of counsel as it relates to the bad faith finding.

## Denial of Damages to Miller

The Bankruptcy Court considered Miller's request for damages and declined to award damages finding that Miller failed to prove damages with a degree of certainty and further because Miller failed to prove that the damages alleged were proximately caused by the filing of the involuntary petition.  [Dkt. 6-1, p. 123].  The Bankruptcy Court further declined to award punitive damages because the deterrent purpose was adequately served by the award of attorney fees.  [Dkt. 6-1, p. 126].  Miller has appealed these findings.[13] Miller acknowledges that he did not have the current financial evidence to demonstrate loss of income, but since he was in the process of reestablishing his national environmental law

---

[12]  This recommendation will not require remand of the case for further proceedings because no damages were awarded and elsewhere in the report the undersigned recommends that the Bankruptcy Court's decision about damages be affirmed.

[13]  In their response brief, the creditors point out that the only aspects of the Bankruptcy Court's order concerning damages that Miller appealed are: 1) the finding that his claims for lost future profits were unsubstantiated; and 2) the refusal to award punitive damages.  Miller's reply brief does not dispute that assertion.

practice, the Bankruptcy Court should have relied on cases discussing the issue of lost income as it relates to new or start up businesses. Miller also argues that the Bankruptcy Court erred in refusing to award punitive damages, given the bad faith finding.

The burden is on the party seeking damages to provide evidence of the amount of damages. *Jennings v. Rivers*, 394 F.3d 850, 853 (10th Cir. 2005)(it is axiomatic that a plaintiff bears the burden of providing evidence supporting a claim of damages). The only information Miller offered in support of his future lost profits was his own self-serving estimate of lost income and the assertion that he was "absolutely confident in representing to the Court that the foregoing actual damage amounts are very conservative." [Dkt. 6-1 pp. 31, 118].[14] Regardless of what standard is applied, the undersigned finds no error in the Bankruptcy Court's conclusion that such a statement will not support a damage award.

The Bankruptcy Court's decision not to award punitive damages was clearly within its discretion.

## Conclusion

The undersigned United States Magistrate Judge RECOMMENDS that the decision of the Bankruptcy Court be AFFIRMED except for the finding that the Creditors filed the involuntary petition in bad faith.

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma on or before February 20, 2012.

---

[14] Miller waived an evidentiary hearing on his alleged damages. [Dkt. 6-1, pp. 96-97].

If specific written objections are timely filed, Fed.R.Civ.P. 72(b)(3) directs the district judge to:

> determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

See also 28 U.S.C. § 636(b)(1).

The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for de novo review by the district court or for appellate review.

DATED this 6th day of February, 2012.

Frank H. McCarthy

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE